[Crim. No. 4406.   In Bank.   Aug. 3, 1942.]

In re JOSEPH TENNER, on Habeas Corpus.

William F. Herron for Petitioner.

Earl Warren, Attorney General, and David K. Lener, Deputy Attorney General for Respondent.

EDMONDS, J.—The question presented for decision by the petitioner's application for a writ of habeas corpus concerns the constitutionality of the Uniform Act for Out-of-State Parolee Supervision (Stats. 1937, p. 469; Deering's Gen. Laws, 1937, Act 5783.) He is held by the respondent Chief of Police pursuant to the direction of the Board of Prison Terms and Paroles of the State of Washington as a convict whose parole has been revoked.

It appears that after his conviction of a felony and sentence to serve five years in the Washington State Penitentiary, the petitioner was granted a parole, and, in connection therewith, permission to come to this state. Later, the Board of Prison Terms and Paroles revoked his parole and ordered that he be returned to the penitentiary. Following his arrest upon the order of this board, he filed in the superior court a petition for a writ of habeas corpus. Upon the denial of

his petition, he applied to the United States Supreme Court for a writ of certiorari. That court denied the writ, but issued its order prohibiting the State of California from removing Tenner, or permitting him to be removed from the state, pending the filing by him of a petition for a writ of habeas corpus in this court and a determination of the issues presented by it.

The Constitution of the United States provides that, without its consent, no state shall enter into any agreement or compact with another state. (Art. I, § 10.) Recognizing this constitutional prohibition, in 1934, the Congress of the United States enacted a statute which reads as follows: ''The consent of Congress is hereby given to any two or more States to enter into agreements or compacts for cooperative effort and mutual assistance in the prevention of crime and in the enforcement of their respective criminal laws and policies, and to establish such agencies, joint or otherwise, as they may deem desirable for making effective such agreements and compacts.'' (48 Stats. 909, 18 U. S. C. A. § 420, 1941 Supp.)

A majority of the states, including California and Washington, have enacted the Uniform Act for Out-of-State Parolee Supervision, *supra*. It authorizes the governor to enter into a compact on behalf of the state with any of the United States legally joining therein permitting parolees to reside out of the state in which they have been convicted and sentenced. The compact obligates the receiving state to assume the duties of their visitation and supervision and makes provision for the retaking of parolees in these terms: ''That duly accredited officers of a sending State may at all times enter a receiving State and there apprehend and retake any person on probation or parole. For that purpose no formalities will be required other than establishing the authority of the officer and the identity of the person to be retaken. All legal requirements to obtain extradition of fugitives from justice are hereby expressly waived on the part of States party hereto, as to such persons. The decision of the sending State to retake a person on probation or parole shall be conclusive upon and not reviewable within the receiving State. If at the time when a State seeks to retake a probationer or parolee there should be pending against him within the receiving State any criminal charge, or he should be suspected of having committed within such State a criminal offense, he shall not be retaken without the consent of the receiving State

until discharged from prosecution or from imprisonment for such offense.'' (§ 3.)

Concededly the compact authorized by the California statute and that of Washington was ratified by each of these states and has not been renounced. But, according to the petitioner, it is unconstitutional in that it is repugnant to the provisions of article IV, section 2, clause 2 of the United States Constitution and to section 5278 of the Revised Statutes of the United States (18 U. S. C. A. § 662) providing for the extradition of fugitives from justice. More specifically, the petitioner contends that extradition is the sole means by which an alleged fugitive may be rendered up by one state to another. He also argues that the compact is contrary to the provisions of article I, section 10, clause 3 of the Constitution of the United States providing that no state shall, without the consent of Congress, enter into any agreement or compact with another state, and, finally, that it deprives the petitioner of his liberty without due process of law in violation of the Fourteenth Amendment to the United States Constitution.

The respondent takes the position that the legislation under attack does not violate any constitutional provision. On the contrary, he justifies the compact as one expressly authorized by the act of Congress relating to agreements between states (*supra*). He also argues that the congressional act may be deemed a statute empowering the states to enter into mutual compacts for the interstate transportation of criminals in aid of the enforcement of their penal laws under the interstate commerce clause of the Constitution. In addition, the respondent contends that the state has the right, under its police powers reserved by the Tenth Amendment to the United States Constitution, to exclude from its borders convicts and fugitives from justice.

The administration of parole is an integral part of criminal justice, having as its object the rehabilitation of those convicted of crime and the protection of the community. Unquestionably such rehabilitation of a parolee may often be facilitated by transferring him to another state, with new surroundings and better opportunities for employment. It is apparent, however, that the success of such out-of-state transfers requires adequate control and intelligent supervision of parolees during the period of their readjustment to civil life. And from the standpoint of the protection of society, there is

sound reason for an agreement between states that the authority over parolees should follow them across state lines. The knowledge on the part of the out-of-state parolee that he may summarily be returned to prison for any violation of the rules which he has agreed to obey undoubtedly is an effective check upon any inclination to violate parole.

The compact represents the social policy of both California and Washington in this regard. It is an agreement for cooperative effort and mutual assistance in the prevention of crime and in the enforcement of the criminal laws of each state within the contemplation of the federal legislation and therefore does not violate the prohibition of the Constitution concerning compacts between states.

Nor does the act of the respondent deprive the petitioner of his liberty without due process of law in violation of the Fourteenth Amendment to the United States Constitution. He had his day in court when he was tried and convicted of a felony and sentenced to a maximum term of five years in the Washington State Penitentiary. The parole which he accepted was granted upon the express condition that the Board of Prison Terms and Paroles ''may at any time within its discretion and without notice cause the parolee to be returned to the said institution to serve the full maximum sentence or any part thereof.'' One convicted of crime has the right to reject an offer of parole, but once having elected to accept parole, the parolee is bound by the express terms of his conditional release. (*In re Peterson,* 14 Cal. (2d) 82 [92 P. (2d) 890].)

The most serious question presented by the petitioner is his contention that article IV, section 2, clause 2, of the United States Constitution providing for the extradition of criminals and the act of Congress carrying that constitutional provision into effect constitute the sole method by which a parolee whose parole has been revoked may be returned to the state in which he was convicted. The Constitution provides:

''A person charged in any State with treason, felony, or other crime, who shall flee from justice, and be found in another State, shall, on demand of the executive authority of the State from which he fled, be delivered up, to be removed to the State having jurisdiction of the crime.'' This provision is not self-executing (*Kentucky* v. *Dennison,* 24 How. 66 [16 L. Ed. 717] ; *Roberts* v. *Reilly,* 116 U. S. 80 [6 S. Ct.

291, 29 L. Ed. 544]; *Hyatt* v. *New York*, 188 U. S. 691 [23 S. Ct. 456, 47 L. Ed. 657]), and Congress, by statute, established the procedure to make it effective.

"Whenever the executive authority of any State or Territory demands any person as a fugitive from justice, of the executive authority of any State or Territory to which such person has fled, and produces a copy of an indictment found or an affidavit made before a magistrate of any State or Territory, charging the person demanded with having committed treason, felony, or other crime, certified as authentic by the governor or chief magistrate of the State or Territory from whence the person so charged has fled, it shall be the duty of the executive authority of the State or Territory to which such person has fled to cause him to be arrested and secured, and to cause notice of the arrest to be given to the executive authority making such demand, or to the agent of such authority appointed to receive the fugitive, and to cause the fugitive to be delivered to such agent when he shall appear." (Rev. Stats. § 5278, 18 U. S. C. A. § 662.) It has been held that a convict whose parole has been revoked is a fugitive from justice within the meaning of this statute, even though he entered the asylum state with the consent of the paroling authorities, and is subject to return to the demanding state by extradition proceedings. (*In re McBride,* 101 Cal. App. 251 [281 Pac. 651]; for cases from other jurisdictions see notes in 78 A. L. R. 419, 8 A. L. R. 903.)

The validity of legislation in aid of the act of Congress concerning extradition is now well established (*Dennison* v. *Christian,* 196 U. S. 637 [25 S. Ct. 795, 49 L. Ed. 630], affirming 72 Neb. 703 [101 N. W. 1045, 117 Am. St. Rep. 817]; *Ex parte White,* 49 Cal. 433; *Kurtz* v. *State,* 22 Fla. 36 [1 Am. St. Rep. 173]; *Ex parte Ammons,* 34 Ohio St. 518; *Ex parte Romanes,* 1 Utah 23) and it has been held that a state may legislate upon a subject of extradition unprovided for because Congress failed to extend section 5278 of the Revised Statutes to the full limits of constitutional power. (*Innes* v. *Tobin,* 240 U. S. 127 [36 S. Ct. 290, 60 L. Ed. 562].) But all legislation which the courts have heretofore considered had reference to the federal extradition procedure. The interstate compact, however, is not of that character. It provides: "All legal requirements to obtain extradition of fugitives from justice are hereby expressly waived on the part of States party hereto, as to such persons." (§ 3 [3].) This can only mean that states which are parties to the compact

have established a method to procure the return of parolees from one state to another, which is entirely independent of the extradition procedure. And whether states may mutually agree upon a method of securing the return of a certain class of fugitives other than by way of extradition is a question apparently never before decided by any court.

Prior to the adoption of the Constitution, the states or colonies regulated the return of fugitives by agreement. If no compact existed between the demanding state and the asylum state, an escaped prisoner might remain in the asylum state with impunity. The question then is, did the framers of the Constitution intend to prevent the states from entering into agreements for the return of prisoners, or did they intend only to provide a federal procedure which would not necessarily be an exclusive one.

The Supreme Court of the United States succinctly stated the purpose of the constitutional provision concerning extradition in two early cases. In the first of these, after an exhaustive discussion of its history and purpose, the court said: ". . . it is manifest that the statesmen who framed the Constitution were fully sensible, that from the complex character of the government, it must fail unless the states mutually supported each other and the General Government; and that nothing would be more likely to disturb its peace, and end in discord, than permitting an offender against the laws of a State, by passing over a mathematical line which divides it from another, to defy its process, and stand ready, under the protection of the State, to repeat the offense as soon as another opportunity offered." (*Kentucky* v. *Dennison, supra.*) "The sole object of the provision of the Constitution and the Act of Congress to carry it into effect," the court reiterated a short time later, "is to secure the surrender of persons accused of crime, who have fled from the justice of a state, whose laws they are charged with violating. . . . No purpose or intention is manifested to afford them any immunity or protection from trial and punishment for any offenses committed in the state from which they flee." (*Lascelles* v. *Georgia,* 148 U. S. 537, 542 [13 S. Ct. 687, 37 L. Ed. 549].)

Except for section 2 of article IV of the Constitution, there would be no question concerning the right of states to provide, by their joint agreement, for the return of a certain class of fugitives, subject, of course, to the consti-

tutional provision regarding interstate compacts. The right created by article IV, it has been held, is a guarantee of which a state may avail itself to secure the return of an offender against its law. (*State* v. *Parrish,* 242 Ala. 7 [5 So. (2d) 828, 832] ; *Ex parte Roberts,* 186 Wash. 13 [56 P. (2d) 703].) And since the extradition provision is not for the benefit of the fugitive, an asylum state may require the governor to surrender a fugitive on terms less exacting than those imposed by the act of Congress. (*State ex rel. Treseder* v. *Remann,* 165 Wash. 92 [4 P. (2d) 866, 78 A. L. R. 412].) As authority to require the return of fugitives originally existed in the states and remains there except as expressly limited by the Constitution, even in the field of federal extradition, the act of Congress is not exclusive of state action which does not come within its express terms. On the contrary, said the Supreme Court of the United States, it must have been intended to leave subjects within the constitutional power and not provided for by that statute subject to the state authority which then controlled them. (*Innes* v. *Tobin, supra.*)

Neither the terms of the constitutional provision nor the act of Congress making it effective indicate that the extradition procedure was intended to be exclusive. Indeed, the language of the act of Congress provides that the duty of the asylum state to deliver the fugitive does not arise under federal law until "the executive authority of any State or Territory demands any person as a fugitive from justice" in a specified manner. And as the Supreme Court of Florida has pointed out: "Neither the Act of Congress nor the Constitution of the United States relate [*sic*] in any way to fugitives from justice from one state to another, or makes any provision concerning them until a *demand* has been made for their delivery. 'The demand is evidently the initial point at which the Constitution and the law begin to operate, and prior to this neither has any application to the case.' Id. While legislation by a state against the constitution and the law of Congress, impairing the full operation of their provisions, would be nugatory, yet it is competent for a state legislature to enact laws on the subject at a stage prior to that which the constitution and federal laws have designated as the time at which they take cognizance of it, provided that such enactments are not inconsistent with the end named in the constitution." (*Kurtz* v. *State, supra.*)

Of course, when a state elects to use the method of federal

extradition, and in so doing has made the demand as required by the Constitution and act of Congress, the federal law applies and governs the procedure of return. And any legislation of the asylum state which purports to limit the exercise of this constitutional guarantee to the demanding state, such as requiring greater evidence of guilt to be produced than is required by the federal act is unconstitutional. (*Re Briscoe*, 51 How. Pr. (N. Y.) 422; *Kurtz* v. *State, supra.*) If, however, the return of the fugitive may be effected without the necessity of invoking the constitutional guarantee to the demanding state, no question of federal constitutional law is involved.

The existence of an independent method of securing the return of out-of-state parolees does not conflict with nor render ineffectual the federal laws with relation to extradition. The federal method of extradition is always present and may be invoked when necessary to secure the right to return of the fugitive to the demanding state. Also states not party to the interstate compact are free to invoke that procedure to secure the return of fugitive parolees. And if a state has elected to follow the federal procedure and claim the constitutional guarantee, the fugitive of course has the right to insist, on habeas corpus, that the procedure conform to the federal law. Similarly the parolee detained under the interstate compact has the right to complain, by means of habeas corpus, if that law is not complied with by the authorities. But no right exists on the part of the parolee, whose parole has been revoked, to claim that he may only be removed by the method of his choosing. ▮ And since the statute applies uniformly to all parolees from states party to the compact, the petitioner may not complain that the statute deprives him of the equal protection of the laws. (*Caskey Baking Co.* v. *Commonwealth of Virginia*, 313 U. S. 117 [61 S. Ct. 881, 85 L. Ed. 1223]; *Williams* v. *Arkansas*, 217 U. S. 79 [30 S. Ct. 493, 54 L. Ed. 673]; *Field* v. *Barber Asphalt Pav. Co.*, 194 U. S. 618, 621 [24 S. Ct. 784, 48 L. Ed. 1142]; *Missouri, etc. R. Co.* v. *May*, 194 U. S. 267 [24 S. Ct. 638, 48 L. Ed. 971]; *Tinsley* v. *Anderson*, 171 U. S. 101 [18 S. Ct. 805, 43 L. Ed. 91]; *Minneapolis, etc. R. Co.* v. *Beckwith*, 129 U. S. 26 [9 S. Ct. 207, 32 L. Ed. 585]; *Walston* v. *Nevin*, 128 U. S. 578 [9 S. Ct. 192, 32 L. Ed. 544]; *Barbier* v. *Connolly*, 113 U. S. 27 [5 S. Ct. 357, 28 L. Ed. 923].)

For these reasons, the writ is discharged and the peti-

tioner is remanded to. the custody of the respondent chief of police.

Gibson, C. J., Shenk, J., Curtis, J., and Traynor, J., concurred.

CARTER, J.—I dissent. While the policy embodied in the Uniform Act for Out-of-State Parolee Supervision (Stats. 1937, p. 469) may be desirable in facilitating the transference from one state to another of violators of parole, I do not believe the legislation can stand in the face of United States Constitution, article IV, section 2, clause 2, and the Congressional Act, 18 U. S. C. A. 662, providing for extradition. It has been uniformly held that the United States Constitution and the act of Congress are paramount in this field and no state statute inconsistent therewith may stand. (*McCline* v. *Meyering*, 75 F. (2d) 716; *Day* v. *Keim*, 2 F. (2d) 966; *Ex parte Morgan*, 20 Fed. 298; *Ex parte Montgomery*, 244 Fed. 967 (affirmed 246 U. S. 656 [38 S. Ct. 424, 62 L. Ed. 924]); *Kuney* v. *State*, 88 Fla. 354 [102 So. 547]; *Fitzpatrick* v. *Williams*, 46 F. (2d) 40; later Florida case, *State* v. *Quigg*, 91 Fla. 197 [107 So. 409, 411]. Authority for interstate rendition of fugitives by extradition emanates solely from the power delegated to the federal government by the Constitution of the United States. In this state, such proceedings are wholly dependent upon the organic and statutory law just quoted. Legislation as to interstate rendition of fugitives being within the power of Congress, the federal law upon that subject is paramount to state Constitutions and statutes. (*People v. Meyering*, 357 Ill. 166 [191 N. E. 318]; *Keeton* v. *Gaiser*, 331 Mo. 499 [55 S. W. (2d) 302]; *Ex parte Owen*, 10 Okla. Cr. 284 [136 Pac. 197; Ann. Cas. 1916A, 522]; *Ex parte Bergman*, 60 Tex. Cr. 8 [130 S. W. 174]; *Ex parte Goodman*, 79 Tex. Cr. 67 [182 S. W. 1120]; *Waller* v. *Jordan*, — Ariz. — [118 P. (2d) 450]; *State* v. *Parrish*, Ala. [5 So. (2d) 828]; *State* v. *Grosch*, 177 Tenn. 619 [152 S. W. (2d) 239]; *In re Sanders*, (Ohio App.) 31 N. E. (2d) 246; *People* v. *Bell*, 372 Ill. 572 [25 N. E. (2d) 45]; *Ex parte Roberts*, 186 Wash. 13 [56 P. (2d) 703].) That being true the act here in question must fall as it is clearly inconsistent with the provisions of the Constitution of the United States and the act of Congress abovementioned. It wholly dispenses with all of the requirements

therein set forth and permits a person to be taken from one state to another by the officers of the state claiming the person by merely establishing identity and violation of parole by a peace officer of the asylum state. The rule announced in the majority opinion is applicable to cases other than those of paroled convicts. It announces the broad general rule that *before a demand* for extradition is made by the demanding state, *the federal laws with reference to extradition are not operative,* and the state may make any regulation it wishes in respect to the matter. In so holding it relies upon a Florida case (*Kurtz* v. *State,* 22 Fla. 36 [1 Am. St. Rep. 173].) The majority opinion states, quoting from the Kurtz case: " 'Neither the Act of Congress nor the Constitution of the United States relate [*sic*] in any way to fugitives from justice from one State to another, or makes any provision concerning them until a *demand* has been made for their delivery. ''The demand is evidently the initial point at which the constitution and the law begin to operate, and prior to this neither has any application to the case.'' Id. While legislation by a state against the constitution and the law of Congress, impairing the full operation of their provisions, would be nugatory, yet it is competent for a state legislature to enact laws on the subject *at a stage prior* to that which the constitution and federal laws have designated as the time at which they take cognizance of it, provided that such enactments are not inconsistent with the end named in the Constitution.' '' (Emphasis added.) If that rule is applied, the federal laws with relation to extradition are completely ignored and rendered wholly ineffective for any purpose. To bring the rule into operation requires only that the governor of the demanding state make no demand, thus no extradition proceedings are initiated. Then the peace officers of that state may go into the asylum state and take the prisoner to their state. Under this practice or procedure extradition as now known would be a thing of the past. It is conceded in the majority opinion that the federal procedure for extradition embraces paroled convicts who breach the terms of their parole. Therefore, the removal of them from this state to another state is in fact extradition but all of the federal law formalities are disregarded. In any event, it cannot be denied that the rule as stated embraces all others charged with crime who are undeniably embraced in the federal extradition laws. To say that before a demand is made no

extradition exists, and therefore the federal laws need not be observed, is to permit that to be accomplished indirectly which could not be done directly. The fact is that if the prisoner is taken from the asylum state to the state where he is charged with the crime, he is beyond doubt extradited, and if extradited, the federal law must be followed, and a state law eliminating all of the federal requirements is a clear invasion of the powers of Congress.

Not only is the language quoted from the Kurtz case wholly dictum, but the court there had in mind an entirely different situation. In conformity with the rule that a state may adopt statutes *in aid* of but *not inconsistent* with the federal laws, it had in mind state laws that provided for the arrest of fugitives from justice by the officers of the asylum state *pending the initiation and completion of extradition proceedings in conformity with the federal laws*. It was contemplated that the extradition that followed would be in conformity with the federal law. Such a law is of course not inconsistent with the federal law being merely in aid of it. But where, as here, the *complete process of extradition* is permitted without following the federal requirements, it cannot be said that the state act is in aid of the federal law.

In my opinion, the California statute in question is in direct conflict with the provisions of the federal Constitution and statutes, and is therefore invalid, and the writ of habeas corpus prayed for by petitioner should be granted and petitioner discharged from custody.

Petitioner's application for a rehearing was denied August 27, 1942. Carter, J., voted for a rehearing.